UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br><br>Charles Eric Kern,<br><br>               Debtor. | Case No.:     20-18381-ABA<br><br>Chapter:      12<br><br>Judge:        Andrew B. Altenburg, Jr.<br><br>Hearing Date:   January 8, 2021 |

**MEMORANDUM DECISION**

## I.    INTRODUCTION

The debtor, Charles Eric Kern, objected to the proof of claim filed by WBL SPE III, LLC ("WBL") as being "unenforceable against the debtor and property of the debtor, under any agreement or applicable law other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). He alleged the claim is unenforceable because (1) the contract interest rate violates both New Jersey's civil and criminal usury statutes, (2) WBL charged a prepayment premium in an unclear and ambiguous manner, (3) the attorneys' fees and costs are not reasonable. He also asks for an accounting of all sums paid by him over the life of the loan so as to determine what portion of payments were attributed to interest as opposed to principal. WBL denied all allegations.

At the debtor's confirmation hearing, the parties agreed to rest on their pleadings. As such, the matter is ripe for adjudication.

The court will deny the objection, except that it will allow only $3,004 of the attorneys' costs and fees, because: (1) New Jersey's civil usury statute specifically excludes corporations from its protection and caselaw extends that exclusion to guarantors of corporate debt, and the New Jersey criminal statute could apply through the Note's Savings Clause, but the court finds instead that Nevada law, which allows for parties to agree to any interest rate, applies; (2) Mr. Kern failed to meet his burden that WBL charged a prepayment premium in an unclear and ambiguous manner; (3) Rule 4:42-9(a)(4) applies and only $3,004 in attorneys' fees and costs are permitted; and (4) in light of the court's decision, Mr. Kern's accounting request is moot.

## II.    JURISDICTION AND VENUE

The court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 1322(b)(1) and 1325(b)(1)(B). Pursuant to Fed. R. Bankr. P. 7052, the court issues the following findings of fact and conclusions of law.

### III. BACKGROUND

<u>The Note</u>

On August 22, 2018, lender BofI Federal Bank, and borrowers CEK Farms, LLC, and Mr. Kern as a sole proprietorship, both "doing business as" Kern Farms, entered into a Business Promissory Note and Security Agreement in the principal amount of $60,000. *See* Doc. No. 82-1, ex. A, p. 6 (as to the promissory note, the "Note"). The loan was denoted a business loan. *Id.*, p. 6, ¶ 1.[1] The daily interest rate was 0.230643835616%, which translates to 83.03% per annum.[2] *Id.*, ¶ 2. The final payment was due November 27, 2019. *Id.*, ¶ 3. The Note provided for a prepayment premium and attorneys' fees and costs. *Id.*, pp. 6, 10, ¶¶ 4, 13.

The Note stated that BofI was "an FDIC insured, federal savings association and this Loan Agreement is approved, and the proceeds are disbursed, by Lender in Nevada." *Id.*, p. 11, § 16(c). It continued:

> CONSEQUENTLY, THIS LOAN AGREEMENT WILL BE GOVERNED BY FEDERAL LAW APPLICABLE TO AN FDIC INSURED INSTITUTION AND TO THE EXTENT NOT PREEMPTED BY FEDERAL LAW, THE LAWS OF THE STATE OF NEVADA WITHOUT REGARD TO CONFLICT OF LAW RULES. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Loan Agreement will be governed by such laws.

*Id.* (capitalization in original). The Note provided for venue in the borrower's state, i.e. New Jersey. *See id.*, p. 11, § 16(d).

The Note provided for the borrowers to pay $310.48 every business day from August 27, 2018 to November 26, 2019, with a final payment on November 27, 2019 of $310.29 plus any remaining outstanding principal, interest and other unpaid charges. *Id.*, ¶ 3. August 27, 2018 to November 27, 2019 was defined as the "Repayment Period." *Id.*

---

[1] Mr. Kern also executed Business Loan Purpose Affidavits for each of the borrowers. Doc. No. 126-1, pp. 47-49.

[2] Mr. Kern calculated the interest rate as translating to 84.19% per year by multiplying the daily rate by 365. But N.J.S.A. 31:1-1(c) states that an annualized rate is computed by multiplying the daily rate by 360.

BofI supplied the borrowers with a Business Loan Summary, informing them that there would be 314 payments of $310.48 due each business day. Doc. No. 126-2, p. 40. The total repayment if paid to maturity would be $97,801.01. *Id.*, p. 6, ¶ 4.

Regarding the interest rate, the Note provided:

Borrower expressly agrees that the interest rate set forth above in Section 2 is appropriate under the circumstances and shall be the applicable rate at which unpaid Principal (and Costs, as defined below) shall bear interest under this Loan Agreement, notwithstanding any rate of interest prescribed by statute from time to time; provided, however, if fulfillment of any provisions of this Loan Agreement or any other instrument securing the Obligations is subject to a law that sets maximum interest rates or other charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Loan Agreement exceed the permitted limits, then
(i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit;
(ii) any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower; and
(iii) the obligations created by this Loan Agreement shall be fulfilled to the limit of such validity as is permitted by law.

*Id.*, p. 11, § 16(h) (hereinafter, the "Savings Clause").

Mr. Kern signed the Note as owner of "CEK Farms, LLC DBA Kern Farms" and as "Charles Eric Kern DBA Kern Farms." *Id.*, p. 14.

Prepayment premium

Regarding the prepayment premium (the "Prepayment Premium"), in addition to being due upon prepayment, the Note provided that "if the Obligations (as defined below) have been accelerated on the happening of an Event of Default (as defined below), payment of Principal and interest shall be deemed a prepayment for purposes of this Section 4 and shall be accompanied by a prepayment premium." *Id.*, p. 7, ¶ 4. Events of Default included failure to pay any payment when due, and the filing of a bankruptcy proceeding, both of which occurred here as the Note remains unpaid past its November 2019 maturity date. *Id.*, p. 9, ¶ 10(a), (c).

The amount of the Prepayment Premium would be determined as follows:

The greater of
(a) fifteen percent (15%) of the amount of the unpaid Principal as of the date of such prepayment or
(b) the aggregate amount required to be repaid by Borrower to Lender during the Repayment Period reduced by the sum of

>(i) the aggregate amount of any payments made by Borrower to Lender pursuant to Section 3 above prior to the date of such prepayment and
>(ii) the amount of the unpaid Principal as of the date of such prepayment[.]

*Id.*, p. 6, ¶ 4.[3]

Accordingly, the Prepayment Premium would either equal 15 percent of the unpaid principal, or $97,801.01 minus all payments made by Mr. Kern to that point and minus the unpaid principal at that point, whichever is greater.

In addition, the Note provided that:

>If Borrower desires to prepay, Borrower shall forward a written request to WBLPayoff@wbl.com. In addition, Borrower may contact Lender's Servicing Agent at 101 Hudson Street 33rd Floor, Jersey City, NJ 07302 or at 212-293-8200 and Lender's Servicing Agent shall provide Borrower with the amount of the unpaid Principal, prepayment premium, and any other amounts due under the terms of the Loan Agreement as of a date designated by Borrower.

*Id.*, p. 6, ¶ 4.


Guaranty

Mr. Kern also executed a "Continuing Guaranty, Personal" ("Guaranty"), on August 22, 2018, for "value received" and as an inducement to BofI to extend credit. *Id.*, p. 20. Under this Guaranty, Mr. Kern guaranteed payment "when due or at the time any Borrower becomes the subject of bankruptcy or other insolvency proceedings" of all "Obligations," defined as including all debts, obligations and liabilities of the borrowers arising out of credit previously granted, including interest, charges, costs, expenses and attorneys' fees." *Id.* The Guaranty recites the same choice of law and venue provisions as the Note. Finally, the Guaranty provided that **"This Guaranty is valid and enforceable against Guarantor even if any Obligation is determined to be invalid or unenforceable against the Borrower."** *Id.*, p. 22 (bold in original).


Mortgage

Finally, in connection with the Note and Guaranty, Mr. Kern and his wife executed a mortgage ("Mortgage") in favor of BofI on 327 Pine Tavern Road, Monroeville, New Jersey owned by them as joint tenants. Doc. No. 82-2, ex. B, p. 3. The Mortgage was a second mortgage on the Pine Tavern property that Mr. and Mrs. Kern rents to tenants. [4] The Mortgage provided that

---

[3] Other calculations set forth applied only to actual prepayments, not prepayment upon default, and therefore will not be recited here.

[4] The debtor states in his Third Amended Chapter 12 Plan that "There is also a mutual debt of the Debtor and Tara Kern with respect to the claim of WBL SPE III, which has a secured claim on 327 Pine Tavern Road by virtue of a

New Jersey law governs the creation, perfection, priority and enforcement of the security interest. *Id.*, p. 9, § 21. However, it further provided that "the provisions of the [Mortgage] relating to the obligations secured" by it "shall be governed by and construed and interpreted in accordance with, the governing law of the Note. Nothing in this Security Instrument shall be construed or interpreted to provide that any other agreement instrument or document shall be governed by the laws of the Property Jurisdiction." *Id.*

On August 19, 2019, Bofi Federal Bank assigned the mortgage to World Business Lenders, LLC ("World Business"). Doc. No. 82-2, ex. B, p. 16. On October 11, 2019, World Business assigned the mortgage to WBL. *Id.*, p. 20.

The proof of claim

WBL's proof of claim, docketed at #13 on the claims' registry, alleges a secured claim in the total amount of $123,629.24. The total owed is comprised of:

| | |
|---|---:|
| Unpaid principal balance | $46,241.14 |
| Interest | 54,887.77 |
| Other fees | 6,444.70 |
| Prepayment premium | 16,055.63 |

**DISCUSSION**

The Federal Rules of Bankruptcy Procedure state that a claim that is properly executed "constitutes *prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). In order to overcome the *prima facie* validity, the objecting party has the burden "to produce evidence sufficient to negate the *prima facie* validity of the filed claim." *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir. 1992). The objecting party needs to present sufficient evidence that negates any essential portion of the claim. *Id.* at 173–174. Should the objecting party provide such evidence, the burden shifts "to the claimant to prove the validity of the claim by the preponderance of the evidence." *Id.* at 174.

(1) Usury Statutes

Mr. Kern asserts that the interest rate on the claim is unenforceable as in excess of that allowed under N.J.S.A. 31:1-1(g), which provides:

> (g) Notwithstanding any other provisions of this section, if the applicable rate prescribed in this subsection exceeds the rate a person would be permitted to charge in the absence of this subsection, the rate of interest which may be taken on a loan for a business or agricultural purpose in the amount of $1,000.00 or more may not

---

mortgage." Doc. No. 163, p. 30. This is not absolutely accurate, as Tara Kern is not liable on any debt to WBL, rather, WBL has a secured claim against property jointly owned by her.

>  exceed 5% in excess of the discount rate, including any surcharge thereon, or any 90-day commercial paper in effect at the Federal Reserve Bank of New York on the day when such loan is made.

N.J.S.A. 31:1-1(g). The remedy under section 31:1-1 is for the lender to recover "the amount or value actually lent, without interest or costs of the action, . . . and no more." N.J.S.A. 31:1-3.

Due to the phase "Notwithstanding any other provisions of this section," subsection (g) exclusively sets the permissible interest rate for loans for more than $1,000 taken for business or agricultural purposes. *See* 1 LexisNexis Practice Guide NJ Commercial Litigation § 7.20 (2020).

Subsection (g) appears to direct one to compare "the applicable rate prescribed in the section" to what one "would be permitted to charge in the absence of this subsection," at a minimum the other subsections of N.J.S.A. 31:1-1(g). If all of those rates are less than subsection (g)'s, then subsection (g) sets an interest rate ceiling of 5% in excess of the discount rate or any 90-day commercial paper in effect at the Federal Reserve Bank of New York on the day when such loan is made (the "Two Subsection (g) Rates"). Oddly, this last part does not say which of the two should apply, i.e., is it the one that is greater or the one that is lesser?

In addition, it is not clear what "the applicable rate prescribed in this subsection" is, unless it is Two Subsection (g) Rates. Mr. Kern does not assert what either of these was in August 2018 when he executed the Note. But subsection (e) of N.J.S.A. 31:1-1 permits "any rate of interest which the parties agree upon" for loans in the amount of $50,000 or more (except for loans for first liens on real property where 1-6 dwelling units are or will be erected). N.J.S.A. 31:1-1(e). Mr. Kern's loan was for $60,000. "Any rate" of course exceeds whatever rate it is that subsection (g) prescribes. Accordingly, the 83.03 percent rate of the Note does not violate subsection (g).

As is obvious from the preceding discussion, what the New Jersey legislature meant in enacting subsection (g) is difficult to discern. Possibly this is one provision contemplated by the comment of one treatise that "the overwhelming majority of mortgage loans by virtue of federal and state enactments are now exempt from interest rate ceilings under New Jersey's civil usury statute, the statute for the most part being non-functional,"[5] although that treatise states without explication that subsection (g) "excepts the *basic rate* of interest for certain business and agricultural loans." § 32.10. Usury, 30A N.J. Prac., Law of Mortgages § 32.10 (2d ed.) (Summary of Exemptions from Civil usury Statute) (emphasis added). The basic rate of 16 percent is found in N.J.S.A. 31:1-1(a), but subsection (e) still overrides that, and in any case, subsection (g) refers to "this subsection," not "this section." The statute then appears nonsensical. But it is for the New Jersey legislature, not this court, to repair.

But this is no matter for several reasons raised by WBL. First, WBL points out that in New Jersey, corporations are barred from raising the defense of usury.

---

[5] For example, New Jersey statute provides that "a residential mortgage lender may make a closed-end loan as a secondary mortgage loan, and may charge, contract for, and receive thereon, interest at an annual percentage rate agreed to by the licensee and the borrower." N.J.S.A. 17:11C-76(a).

> No corporation, limited liability company or limited liability partnership shall plead or set up the defense of usury to any action brought against it to recover damages or enforce a remedy on any obligation executed by said corporation, limited liability company or limited liability partnership.

N.J.S.A. 31:1-6. *See Tabatchnick Realty Grp., LLC v. PNC Bank, N.A.*, CIV.A. 05CV3027(PGS), 2007 WL 557441, at *3 (D.N.J. Feb. 15, 2007) ("The New Jersey usury statute specifically excludes corporations like Tabatchnick Realty from its protection.").

This applies to guarantors of corporate indebtedness, too. *In re Petersburg Regency LLC*, 540 B.R. 508, 538 (Bankr. D.N.J. 2015) ("Corporate officers who guarantee a corporation's obligations are not permitted to raise the usury defense as to the guaranteed corporate obligation."); *Selengut v. Ferrara*, 203 N.J. Super. 249, 258 (App. Div. 1985) ("When loans are actually made to a corporation, usury is not a defense by the individual endorsers or guarantors of the corporate obligation."); *Armin Corp. v. Kullman*, 127 N.J. Super. 600, 603 (Law. Div. 1974) ("It is also well established in the decisions in New Jersey that an individual guarantor of a corporate obligation falls within the ambit of N.J.S.A. 31:1-6, i.e., cannot assert the defense of usury, at least as to interest on the principal debt, which interest itself the individual has undertaken to guarantee.") (citing *Fine v. H. Klein, Inc.*, 10 N.J. Super. 295, 77 A.2d 295 (Cty. Ct .1951); *Liebers v. Plainfield Spanish Homes Bldg. Co.*, 108 N.J. Eq. 391, 155 A. 270 (Ch. 1931), and *Commercial Funding Corp. v. Melroy Const. Co.*, 106 N.J. Eq. 11, 149 A. 586 (Ch. 1930)). *See also Jackson Hewitt Inc. v. Excellent Prof'l Servs. LLC*, 08-CV-5237 JG RER, 2011 WL 317969, at *2 (E.D.N.Y. Jan. 31, 2011) ("Individuals who are in privity with corporations are likewise prohibited from taking advantage of New Jersey's usury protection."); *Bridges Fin. Grp., Inc. v. Beech Hill Co.*, CIV.A. 09-2686, 2010 WL 3946529, at *4 (D.N.J. Oct. 5, 2010) ("when 'the defense of usury cannot be pleaded by the corporate maker of the notes, it is likewise unavailable to the individual endorsers on the notes.'") (quoting *Fine v. H. Klein, Inc.,* 10 N.J. Super. 295, 300, 77 A.2d 295 (Cty. Ct. 1950)). The *Selengut* court even noted that the corporate exception to the defense of usury applying also to individual guarantors is not "peculiar to New Jersey." *Selengut v. Ferrara*, 203 N.J. Super. at 259 (citing 63 A.L.R.2d 924, 950 (1959)).

Courts have refused to apply the exception when "the corporate form is used to cloak a loan which in fact is intended to be a loan to an individual, the Alter ego of the corporation. . . ." *Feller v. Architects Display Bldgs., Inc.*, 54 N.J. Super. 205, 212 (App. Div. 1959) (citing *In re Greenberg*, 21 N.J. 213, 220, 121 A.2d 520 (1956), and *Gelber v. Kugel's Tavern*, 10 N.J. 191, 196, 89 A.2d 654 (1952). *See Armin Corp. v. Kullman*, 127 N.J. Super. 600, 603 (Law. Div. 1974) ("Those decisions are, of course, distinguishable from cases wherein the loan is not a true corporate borrowing and therefore the individuals are allowed to assert the defense of usury."). But Mr. Kern did not raise that.

Mr. Kern alternatively argued that this court should apply New Jersey's criminal usury statute to reduce the interest rate. N.J.S.A. 2C:21-19 provides:

a. Criminal usury. A person is guilty of criminal usury when not being authorized or permitted by law to do so, he:

> (1) Loans or agrees to loan, directly or indirectly, any money or other property at a rate exceeding the maximum rate permitted by law; or

> (2) Takes, agrees to take, or receives any money or other property as interest on the loan or on the forbearance of any money or other interest in excess of the maximum rate permitted by law.

N.J.S.A. 2C:21-19(a).

The statute defines as criminally-usurious "any loan or forbearance with an interest rate [that] exceeds 30% per annum . . . except if the loan or forbearance is made to a corporation, limited liability company or limited liability partnership any rate not in excess of 50% per annum . . . ." *Id.* An entity found guilty of charging the 83 percent charged here would be liable for a crime in the second degree. *Id.*

But N.J.S.A. 31:1-6 still bars Mr. Kern from raising the criminal statute as a defense. The District Court for the District of New Jersey discussed the tension between N.J.S.A. 2C:21-19(a) outlawing an interest rate over 50 percent for corporations and N.J.S.A. 31:1-6 barring corporations from raising a usury defense:

> [W]hile the criminal statute does state that it should apply "notwithstanding *any* law of this State," so does N.J.S.A. 31:1–6 provide that the usury defense is not available to a corporation in *"any* action brought against it" seeking a civil remedy. (emphasis added). Indeed, as it is undisputed that N.J.S.A. 31:1-6 bars a corporation from claiming the protections of the *civil* usury statute, and as [*Resolution Trust Corp. v.*] *Minassian*[*,* 777 F. Supp. 385, 389 (D.N.J.1991),] holds that the civil usury statute incorporates the criminal usury rate, it is unclear to this Court why the [Creditors'] Committee's position would not simply open a back door for corporations to raise a usury defense in civil cases where such defense would otherwise be prohibited. Such a reading would ignore the unambiguous language of N.J.S.A. 31:1–6. The Court thus concludes that the Bankruptcy Court erred in failing to apply N.J.S.A. 31:1–6 to the Debtor's defense of usury in this civil case.

*In re Glob. Outreach, S.A.*, CIV.A. 11-620 JLL, 2011 WL 2294168, at *14 (D.N.J. June 6, 2011).

The *Global Outreach* court considered that "[w]hile the bar against corporations asserting the usury defense serves an important policy of ensuring that corporate obligations are fulfilled, . . . the criminal law is concerned with preventing lenders, both individual and corporate, from exacting usurious rates and punishing those who do, *see* N.J.S.A. 2C:1–2." *In re Glob. Outreach,*

*S.A.*, CIV.A. 11-620 JLL, 2011 WL 2294168, at *15 (D.N.J. June 6, 2011). Despite acknowledging that the matter before it was a civil litigation, the District Court determined that it was appropriate to fashion a civil remedy for the criminal violation. *Id.* It accordingly reduced the interest rate at issue to the criminal statute's 50 percent. *Id.*

While this court understands the District Court's reasoning, it respectfully disagrees with its final determination. As the District Court pointed out, permitting a corporate defendant in civil litigation to plead a criminal statute "open[s] a back door for corporations to raise a usury defense in civil cases where such defense would otherwise be prohibited." *Id.*, at *14.

This court would instead rely on the Savings Clause included in the Note that reduces the Note's interest rate to a permissible level if found to exceed the maximum set by applicable law. This avoids analysis of whether the New Jersey legislature intended a private right of action under N.J.S.A. 2C:21-19, something the *Global Outreach* court did not even consider. *See Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 148 (S.D.N.Y. 2017) (holding that there is no private right of action under New York's criminal usury statute). Indeed, the *Global Outreach* court acknowledged that applying a similar savings clause included in the documents at issue in that case would reach the same result as the court's "fashioned" remedy. *In re Glob. Outreach, S.A.*, 2011 WL 2294168, at *15 ("The Court need not address YA's arguments with respect to the Note's usury savings clause, as the enforcement of that provision would appear to have substantially the same effect as the remedy adopted here."). This seems to be a better way to reach the same result.

But this outcome obtains only if New Jersey law applies. WBL argued that the parties agreed in the Note that, if not preempted by federal law, then Nevada law would apply. As Nevada has no civil or criminal usury laws, WBL asserted, there is no basis to reduce the interest rate on the loan.

The Note states that BofI is a Federal Savings Association ("FSA"). FSAs are permitted to make loans of the type here. 12 U.S.C. § 1464(c)(2)(A) ("The following loans or investments are permitted, but only to the extent specified: (A) Commercial and other loans. Secured or unsecured loans for commercial, corporate, business, or agricultural purposes."). FSAs enjoy the autonomy from state laws:

> (1) Notwithstanding any State law, a savings association may charge interest on any extension of credit at a rate of not more than 1 percent in excess of the discount rate on 90-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district in which such savings association is located or at the rate allowed by the laws of the State in which such savings association is located, whichever is greater.
>
> (2) If the rate prescribed in paragraph (1) exceeds the rate such savings association would be permitted to charge in the absence of this subsection, the receiving or charging a greater rate of interest than that prescribed by paragraph (1), when knowingly done, shall be deemed a forfeiture of the entire interest which the extension of credit carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, the person who paid it may recover, in a

> civil action commenced in a court of appropriate jurisdiction not later than 2 years after the date of such payment, an amount equal to twice the amount of the interest paid from the savings association taking or receiving such interest.

12 USCS § 1463(g).[6] *See* 12 C.F.R. § 160.110(b) ("A savings association located in a state may charge interest at the maximum rate permitted to any state-chartered or licensed lending institution by the law of that state. . . . For example, a Federal savings association may lawfully charge the highest rate permitted to be charged by a state-licensed small loan company, without being so licensed, but subject to state law limitations on the size of loans made by small loan companies."); *Cappalli v. Nordstrom FSB*, 155 F. Supp. 2d 339, 341 (E.D. Pa. 2001), *aff'd,* 28 Fed. Appx. 160 (3d Cir. 2002) ("This provision authorizes the Bank to impose interest charges allowed by the laws of its home state, Arizona, on out-of-state customers such as the plaintiff. It does not matter whether those charges violate Pennsylvania usury laws so long as the charges are "interest" and thus within the scope of section 1463(g)."). Thus, BofI could charge more than one percent over the discount rate for 90-day commercial paper if Nevada law so provided.

Thus, the court turns to Nevada law as that is the state in which BofI was located. WBL asserts that Nevada has no usury statute. The court found that in Nevada,

> A licensee may lend any amount of money:
> 1. At any rate of interest;
> 2. Subject to the imposition of any charge in any amount; and
> 3. Upon any schedule of repayment,
> to which the parties may agree.

*Nev. Rev. Stat. Ann.* § 677.730 (West).[7] A "'Licensee' means a person to whom one or more licenses have been issued." Nev. Rev. Stat. Ann. § 677.110 (West). A "'License' means a license, issued under the authority of this chapter, to accept deposits and make loans in accordance with the provisions of this chapter, at a single place of business." Nev. Rev. Stat. Ann. § 677.100 (West). Thus, BofI could charge any rate of interest to which Mr. Kern agreed.

---

[6] WBL cited subsection (a)(2) of section 1735f-7a of title 12, which exempts *inter alia* FDIC depositary institutions from state laws or constitutional provisions that limit the rate or amount of interest on *deposit accounts*. 12 U.S.C. § 1735f-7a(a)(2). But at issue here is the interest rate on a mortgage, referred to in subsection (a)(1) of section 1735f-7a. But subsection (a)(1) applies only to "any loan, mortgage, credit sale, or advance" that is secured by first liens. 12 U.S.C.A. § 1735f-7a(a)(1)(A). The mortgage at issue here is a second mortgage.

[7] Another Nevada statute provides:

> 1. Except as otherwise provided in subsection 2, parties may agree for the payment of any rate of interest on money due or to become due on any contract, for the compounding of interest if they choose, and for any other charges or fees. The parties shall specify in writing the rate upon which they agree, that interest is to be compounded if so agreed, and any other charges or fees to which they have agreed.

*Nev. Rev. Stat. Ann.* § 99.050 (West). Subsection 2 excepts "consumer credit extended to a covered service member or a dependent of a covered service member." *Nev. Rev. Stat. Ann.* § 99.050(2) (West).

The Office of the Comptroller of the Currency, which regulates federal savings associations, has issued a final ruling that this continues to apply after a bank transfers a loan. *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 85 FR 33530-01, 2020 WL 2836957 (June 2, 2020) ("This rule clarifies that when a bank transfers a loan, the interest permissible before the transfer continues to be permissible after the transfer."). Thus, the fact that WBL is not an FSA does not invalidate the interest provision.

Regarding the federal preemption provision, Mr. Kern countered that the contract was a contract of adhesion and that the mortgage document provided for application of New Jersey law. "A contract of adhesion, simply put, is a contract presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity of the adhering party to negotiate except perhaps on a few particulars." *Martindale v. Sandvik, Inc.*, 173 N.J. 76, 89 (2002) (internal quotation omitted). Mr. Kern did not certify to any facts to support this argument. He claims to be an unsophisticated businessman, but he has been running this farm for 25 years, owns more than one property, leases portions of his properties, and has entered into several secured transactions involving real and personal property. Moreover, since BofI was an FSA, federal law would apply regardless of a choice-of-law provision. Therefore, this argument fails.

The provision of the Mortgage that Mr. Kern cited for arguing that New Jersey law applies recites that it applies to the mortgage's "creation, perfection, priority and enforcement," and that any suit is to be brought in Salem County, New Jersey. The former concerns the mortgage's validity, not the amount secured thereby, and the latter is merely a venue provision. Thus, these arguments fail too.

Finally, within Mr. Kern's federal preemption argument, he argued that BofI was not the true lender, WBL was, and that WBL is a New Jersey corporation therefore New Jersey law should apply. He asserted:

> In determining the true lender, [c]ourts have looked to which institution had a predominant economic interest, for which the key and most determinative factor is which entity placed its own money at risk at any time during the transactions. Courts ha[ve] also looked to the circumstances surrounding the loan application, such as how borrowers applied and the time between completion of the loan application and the assignment to the non-bank entity. Utilizing this doctrine, several courts have held that complete preemption does not apply to a rent-a-bank or rent-a-tribe arrangements.

Doc. No. 141, p. 4.

He provided the court with the decision in *Kaur v. World Bus. Lenders, LLC*, 440 F. Supp. 3d 111 (D. Mass. 2020), discussing "rent-a-banks," that "allow non-bank lenders to borrow FDIC-insured banks' federal preemption. In a typical rent-a-bank arrangement, a non-bank lender will market, fund, and collect on a loan, while a partnered nationally charted bank (or Native American tribe) benefitting from federal preemption will formally underwrite and originate the loan on paper." *Id.*, at 119.

Mr. Kern also supplied a complaint filed by various state Attorneys General, including New Jersey's, against the FDIC, complaining about the exception of FDIC banks from state interest-rate caps. He concluded:

> Thus, based upon the choice of law language put into the mortgage and based upon the Court's finding in Massachusetts, there is at least an inference that World Business Lenders, LLC and BofI Federal Bank have collectively engaged in a rent-a-bank scheme designed to circumvent the usury laws in New Jersey. Therefore, the Motion in this case should not be denied or dismissed.

But Mr. Kern did not produce evidence sufficient to negate the *prima facie* validity of the claim to warrant shifting the burden to WBL to prove that it did not engage in a "rent-a-bank" arrangement—he only alleges that there is "at least an inference" that WBL did this but provides no facts sufficient to shift the burden to WBL.[8] Moreover, even if this court could be persuaded to follow *Kaur*, that court expressly did not determine whether Massachusetts should follow the "true lender" doctrine as opposed to a "valid when made" argument, because the lender at issue complied with Massachusetts' law governing usurious loans. *Kaur v. World Bus. Lenders, LLC*, 440 F. Supp. 3d at 122 ("Because the issues at hand in this case may be decided based on an analysis of the Massachusetts usury law, however, this [c]ourt declines to weigh in on the true lender doctrine, and instead turns to Lenders' separate, viable defense against the three usury claims."). That the Attorney General of New Jersey dislikes federal preemption for FDIC banks is no basis for this bankruptcy court to rule the interest on this loan usurious and therefore unenforceable. *See Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 318–19 (1978) ("Petitioners' final argument is that the "exportation" of interest rates . . . will significantly impair the ability of States to enact effective usury laws. This impairment, however, has always been implicit in the structure of the National Bank Act, since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates. . . . But the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court.").

In sum, the court finds that as Nevada law, which allows for parties to agree to any interest rate, applies to the interest rate in the Note, there is no basis for the court to disallow the interest rate asserted in WBL's claim.

(2) <u>Prepayment premium</u>

Mr. Kern objects to the prepayment premium of $16,055.63. He argues that the provision is not clear and is not unambiguous, and claims that he is not sophisticated in commercial loans.

As set forth, above, the Note provides that the Prepayment Premium is to be paid if the Obligations have been accelerated upon the happening of an Event of Default. It is calculated as the greater of 15 percent of the remaining unpaid principal or the total required to be paid by the

---

[8] BofI did not assign the mortgage until a full year after it was executed. On the other hand, in the Prepayment Premium section of the Note, the borrower is directed to WBLpayoff@wbl.com for information regarding the premium, thus WBL SPE III, LLC or an affiliate may have been involved from the beginning. Mr. Kern did not raise these facts.

borrower less payments made and the amount of unpaid principal. WBL calculates the two methods as follows:

(a) Fifteen percent of the unpaid principal balance of $46,241.14 equals $6,936.17.

(b) Total repayment shown on Business Loan Summary  $97,801.01
    principal balance remaining  (46,241.14)
    principal and interest paid  (35,504.24)

Penalty equals  $16,055.63

As $16,055.63 is greater than $6,936.17, the former is the Prepayment Penalty. The court does not find this calculation difficult—the borrower need only subtract two numbers from one—and notes that, in addition, the Note provided several avenues of contact for Mr. Kern to find out the amount of the Prepayment Premium.[9]

Mr. Kern did not dispute any of the figures supplied by WBL in this calculation. But he did cite law to support his argument that a Prepayment Premium must be reasonable. In *T.D. Bank, N.A. v. Shree Swaminarayan Satsang Mandal, Inc*., 2018 N.J. Super. Unpub. LEXIS 2081 (App. Div. 2018), the Superior Court Appellate Division stated as follows:

> Under New Jersey law, when a note clearly and unambiguously includes language that provides for a prepayment premium, even upon acceleration by the mortgagee, and the parties to the contract are sophisticated in commercial loans, then the prepayment provision is presumed valid and enforceable. *Westmark Commercial Mortg. Fund IV v. Teenform Associates, L.P.*, 362 N.J. Super. 336, 347, 827 A.2d 1154 (App. Div. 2003). However, a prepayment premium, like late fees and default interest rates, must be reasonable under the totality of the circumstances. *Mony Life Ins. Co. v. Paramus Parkway Bldg.*, Ltd., 364 N.J. Super. 92, 103, 834 A.2d 475 (App. Div. 2003).

*Id.*, at *7-*8.

Mr. Kern did not certify as to how the Prepayment Premium is unreasonable. He also provided no basis for the court to determine that he is unsophisticated in business: The record reveals that this was just one of many commercial contracts he entered into.

Accordingly, the court will not disallow the Prepayment Premium.

---

[9] WBL also asserted that it supplied the debtor with the necessary documents to calculate the prepayment penalty applying the plain language of the prepayment penalty provision of the note, but the Business Loan Summary, Doc. No. 126-1, p. 40, does not provide the principal balance remaining or the principal and interest paid to date.

(3) <u>Attorneys' fees</u>

Mr. Kern objects to the charge in the Proof of Claim for the $6,444 charged as attorneys' fees, asserting that the invoices WBL attached only show $4,624 in fees, and that there is no indication how that amount is reasonable. He also bases his objection on the limit on attorneys' fees in foreclosure actions set forth by N.J. Rule 4:42-9(a)(4):

> (4) In an action for the foreclosure of a mortgage, the allowance shall be calculated as follows: on all sums adjudged to be paid the plaintiff amounting to $5,000 or less, at the rate of 3 ½ %, provided, however, that in any action a minimum fee of $75 shall be allowed; upon the excess over $5,000 and up to $10,000 at the rate of 1 ½ %; and upon the excess over $10,000 at the rate of 1%, provided that the allowance shall not exceed $7,500. If, however, application of the formula prescribed by this rule results in a sum in excess of $7,500, the court may award an additional fee not greater than the amount of such excess on application supported by affidavit of services. In no case shall the fee allowance exceed the limitations of this rule.

N.J. Ct. R. R. 4:42-9(a)(4). The court calculates the fees allowable under this rule on $117,185 ($123,629 minus the asserted $6,444 in attorneys' fees) as $1,322.

WBL submitted the invoices from its attorneys, showing the following:

| Date | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| 7/25/2019 | TAI-Foreclosure Search | | | $365.00 |
| 7/25/2019 | Walz – NJFC NOI – Cost - Recoverable | | | 2.00 |
| 7/25/2019 | Walz – NJFC NOI – Service - Recoverable | | | 25.20 |
| 7/25/2019 | Walz – NJFC NOI – Cost - Recoverable | | | 2.00 |
| 11/12/2019 | TAI-Upper Courts Search - Recoverable Upon the Filing of the Complaint | | | 11.00 |
| 11/13/2019 | Certificate of Regularity – Complaint Review - Non-Recoverable | | | 75.00 |
| 03/30/2020 | Collateral Account-NJ – Complaint Filing Cost-NJ - Recoverable Upon the Filing of the Complaint | | | 405.00 |
| 04/09/2020 | Service of Process | | | 520.00 |
| 05/08/2020 | TAI-Lis Pendens / Recording Cost - Recoverable Upon the Filing of the Complaint | | | 72.00 |
| 05/26/2020 | TAI-Continuation Search - Recoverable | | | 140.00 |
| 06/26/2020 | Service of Process | | | 65.00 |
| | **TOTAL** | | | **$1,682.20** |

| Date | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| 8/15/2019 | Hourly fee – attorney; Review title documents and foreclosure docket F 9127-19 to determine if our property is impacted by this foreclosure | $275.00 | 1.30 | 357.50 |
| 11/13/2019 | Hourly Fee – Attorney Review loan documents, title search and online foreclosure docket concerning neighboring property; Draft commercial foreclosure complaint | 275.00 | 3.70 | 1,017.50 |
| 03/27/2020 | Hourly Fee – Attorney - Review title search and client comments re: commercial mortgage foreclosure complaint | 275.00 | 0.70 | 192.50 |
| 04/01/2020 | Hourly Fee – Attorney - Review filed complaint and loan documents; Draft Lis Pendens for recording with County Clerk | 275.00 | 0.70 | 192.50 |
| 05/13/2020 | Hourly Fee – Attorney - Review filed pleadings and affidavits of service; Draft default package | 275.00 | 2.50 | 687.50 |
| 06/03/2020 | Hourly Fee – Attorney - Review title bringdown | 275.00 | 0.50 | 137.50 |
| 06/08/2020 | Hourly Fee – Attorney - Draft amended complaint joining judgment creditors identified on title bringdown | 275.00 | 1.30 | 357.50 |
| | **TOTAL** | | | **$2,942.50** |

Review of these attorney invoices reveal that all of the fees related to an intended foreclosure action. Accordingly, Rule 4:42-9(a)(4) applies. *Coastal State Bank v. Colonial Wood Products, Inc.*, 172 N.J. Super. 320, 324 (App. Div. 1980). Adding the permissible $1,322 to the $1,682 in costs yields $3,004.

Accordingly, the court will disallow $3,440 of the attorneys' fees (i.e., will allow only $3,004 in attorneys' fees and costs).

(4) <u>Accounting of amounts paid</u>

Given that Mr. Kern seeks this to determine how much usurious interest he paid, this request is moot.

## IV. CONCLUSION

Accordingly, the court will allow WBL's claim as to the interest rate and the Prepayment Premium. It will disallow $3,440 of the attorneys' fees.

An appropriate judgment has been entered consistent with this decision.

The court reserves the right to revise its findings of fact and conclusions of law.

/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: February 1, 2021